IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Lewis T. Babcock, Chief Judge

Civil Action No. 05-cv-00947 - LTB - MJW

HENRY CLAY COX, JR.,

      Plaintiff,

v.

TXU ENERGY SOLUTIONS COMPANY, LP,

      Defendant.

_____

ORDER
_____

This case is before me on Defendant TXU Energy Solutions Company, L.P.'s ("TXU")

Motion for Summary Judgment. By the Motion, TXU seeks judgment in its favor on Plaintiff

Henry Clay Cox, Jr.'s ("Cox") claims for hostile work environment, race discrimination and

retaliation. After consideration of the motion and all related pleadings, as well as the oral

argument held on March 9, 2007. I grant Defendant's motion in part and deny it in part for the

following reasons.

## I. Background

TXU was formed to provide energy management services to commercial customers. TXU

referred to these services as its "Strategic Accounts Business."

In 1999, TXU acquired Service Master Energy Management Group ("Service Master"),

which at the time employed Cox, an African American, as a Senior Project Manager. Following

this acquisition, Cox was hired by TXU in the same Senior Project Manager position that he held

with Service Master. Cox and other Service Master employees hired by TXU became part of

TXU's Strategic Accounts Business and were referred to as the Energy Savings Agreements Operations Group (the "ESA Group"). The ESA Group primarily serviced clients in the healthcare industry.

Initially, Jim Kobbe ("Kobbe") was the Operations Manager for the ESA Group. Sometime around July of 2001, however, Kobbe transferred to another position at TXU. Rather than replace Kobbe, TXU initially divided his responsibilities as Operations Manager among four employees, including Cox. Then, in May of 2002, following an interview process involving several candidates, Cox was promoted to Operations Manager for the ESA Group. After his promotion, Cox requested that he be assigned a particular office. This request was approved by TXU, but another TXU manager moved into the office before Cox could do so. This employee, who was white, was allowed to remain in the office that Cox wanted, and Cox was offered another office instead.

On January 1, 2003, after suffering substantial losses, TXU informed its employees that it was selling its Strategic Accounts Business, including the ESA Group. At this time, TXU assumed that the ESA Group would continue operating as it had been until the sale and that all of the ESA Group's employees and clients would be part of the sale. Accordingly, TXU offered 6 month retention agreements to the ESA Group employees, which consisted of Cox and five male project managers, to ensure their employment from January 20, 2003 through July 21, 2003. TXU began laying off other Strategic Accounts Business employees as part of a reduction-in-force.

Shortly after these events, Cox requested that the Tracking Staff for the Strategic Accounts Business, which consisted of all women, be made part of the ESA Group. This request

was granted, and the Tracking Staff became part of the ESA Group in March of 2003.  Since the Tracking Staff employees were not part of the ESA Group in January of 2003, they had not been offered retention agreements at that time.  Their entitlement to comparable agreements became an issue following their incorporation into the ESA Group.

TXU's initial efforts to sell its Strategic Accounts Business were unsuccessful. Consequently, in June of 2003, TXU began plans to offer further retention agreements to ESA Group employees, including Cox, to ensure their employment after July 21, 2003.  TXU also decided to sell the Strategic Accounts Business's contracts on a group-by-group basis and began negotiating the sale of the ESA Group's contracts with American Energy Assets ("AEA"). During these negotiations, AEA advised TXU that it was not interested in hiring all of the ESA Group employees.

Around the same time that TXU was negotiating the sale of the ESA Group to AEA, the initial retention agreements extended to ESA Group employees, including Cox, were approaching their July 21, 2003 expiration date.  To address the concerns of these employees regarding their continued employment and compensation, Kevin Bohn ("Bohn") of TXU scheduled a mandatory meeting in Dallas on July 30, 2003.  Cox advised Bohn, however, that the ESA Group employees were not interested in attending this meeting as a result of pending "HR issues" including "harassment, hostilities, and intimidation."  Around this same time, other ESA Group employees expressed their displeasure with the way that Cox and their group were being treated directly to TXU.  As a result of these complaints, the Dallas meeting was cancelled.

Following the cancellation of the Dallas meeting, TXU decided to offer new retention agreements to a total of 6 ESA Group employees and to lay off the 3 remaining ESA Group

employees, including Cox, with severance.  Accordingly, Cox was laid off from his employment

with TXU effective July 31, 2003 though he remained on TXU's payroll through August 31,

2003.  By April of 2004, all of the Project Managers in the ESA Group had been laid off.

After being laid off by TXU, Cox started The Solutions Group ("TSG"), which provides

energy consulting services. Shortly after the formation of TSG, Scott Harrison ("Harrison"), the

Director of Operations Management for TXU contacted the Martin Luther King, Jr./Charles R.

Drew Medical Center ("KDMC") of Los Angeles County, California  regarding the status of its

contract with TXU.  KDMC indicated that it would like this contract to be sold to TSG.  Harrison

discussed this possibility with Cox, who had worked on the KDMC contract for some time, and

advised him that he could be required to release any claims he had against TXU as a condition of

the sale of the KDMC contract to TSG.  TXU then submitted a written proposal to TSG that

provided a sale price of approximately $800,000, but did not contain any requirement that Cox

release any claims that he may have had against TXU.  Although it is unclear whether the sale

price in this proposal was for the KDMC contract only or whether it also included contracts for

two other California healthcare facilities, the parties are in agreement that the value of the other

two contracts was minimal relative to that of the KDMC contract.  TSG responded to TXU's

proposal  by offering $229,000 for the KDMC contract.  TXU ultimately agreed to sell the three

healthcare facility contracts to AEA for $600,000 subject to KDMC's approval of the assignment.

Of this amount, over $400,000 was allocated the the KDMC contract.  KDMC never approved

the assignment of its contract with TXU to AEA, however, and TXU instead terminated this

contract for nonpayment.

On February 18, 2004, Cox filed a Charge of Discrimination with the EEOC wherein he alleged that he was subjected to a hostile work environment; that he was discriminated against on the basis of race; and that TXU retaliated against him.

## II. Standard of Review

The very purpose of a summary judgment motion under Fed. R. Civ. P. 56 is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Rule 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The non-moving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, interrogatories, and admissions on file together with affidavits, if any, which it believes demonstrate the absence of genuine issues for trial. *Celotex*, 477 U.S. at 323; *Mares v. ConAgra Poultry Co., Inc.*, 971 F.2d 492, 494 (10th Cir. 1992). Once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried. *Otteson v. U.S.*, 622 F.2d 516, 519 (10th Cir. 1980); Fed.R.Civ.P. 56(e). These specific facts may be shown "by any of the kinds of evidentiary materials listed in Rule 56(c), except the pleadings themselves." *Celotex*, 477 U.S. at 324.

If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial. *Celotex*, 477 U.S. at 323. The operative inquiry is whether, based on all documents submitted, reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). However, summary judgment should not enter if, viewing the evidence in a light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor, a reasonable jury could return a verdict for that party. *Anderson Liberty Lobby, Inc.*, 477 U.S. at 252; *Mares*, 971 F.2d at 494.

### III.  Analysis

**A.  The Timeliness of Plaintiff's Claims**

TXU first argues that Cox is not entitled to recover for alleged discriminatory acts that occurred prior to April 23, 2003, or 300 days before he filed his Charge of Discrimination. *See* 42 U.S.C. § 2000e-5(e)(1). Cox concedes this point but contends that acts occurring before this date may nonetheless constitute "relevant background evidence." Accordingly, I will consider evidence of these prior acts in the context of TXU's motion for summary judgment as appropriate. Nothing in this Order shall, however, preclude TXU from challenging the relevance or admissibility of alleged discriminatory acts occurring prior to April 23, 2003 at a later date.

**B.  Plaintiff's Claim for Hostile Work Environment**

To establish a prima facie case of a racially hostile work environment, Cox must show that "under the totality of circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment and (2) the harassment was racial or stemmed from racial animus." *Trujillo v. Univ. of Colo. Health Sciences Ctr.,* 157 F.3d 1211, 1214 (10th

Cir. 1998).  TXU argues that Cox's hostile work environment claim must fail because he cannot establish either element of the prima facie case.  I agree.

In evaluating the first element of a claim for hostile work environment, I am required to look at all the circumstances, including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance."  I am also required to evaluate Cox's working environment both objectively and subjectively.  *McCowan v. All Star Maint., Inc.,* 273 F.3d 917, 923 (10th Cir. 2001).  Thus, Cox's working environment must be "one that a reasonable person would find hostile and abusive, and one that the victim did in fact perceive to be so."  *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998).

Here, Cox is vague about the specific conduct that gives rise to his hostile work environment claim.  For instance, Cox generally claims that TXU's entire Denver office became hostile towards him after he did not get the office he requested when he was promoted to Operations Manager, but provides little to no detail to support a finding that this was the case. Likewise, Cox alludes to a racially offensive remark made about him by one of his co-workers to other co-workers outside of his presence but admits that he does not know the precise nature of the statement and that TXU addressed the situation directly.  In the absence of further detail, Cox's complaints are for all intents and purposes devoid of the racial comments and ridicule that are the hallmarks of racially hostile work environment claims.  *See Trujillo, supra,* 157 F.3d at 1214.  Instead, Cox's complaints reflect generic workplace tension and personality conflict that is neither severe or pervasive enough to support a hostile work environment claim.

By the same token, Cox is unable to show that any harassment to which we was subjected was racial in nature or stemmed from racial animus. To the contrary, by Cox's own testimony, the hostile environment to which he claims he was subjected stemmed primarily from a particular incident when he did not receive the office he requested.  Additionally, I conclude that neither Cox's reliance on a single, unspecified racially offensive comment or his status as the sole African American employee in TXU's Denver office are sufficient to raise a triable issue as to whether his negative work environment was the result of racial animus.  *See Chavez v. New Mexico,* 397 F.3d 826 (10th Cir. 2005) (holding that two racially offensive remarks allegedly made by supervisor fell short of the steady barrage required for hostile work environment claim and that being sole member of racial minority within a supervisor's command does not, without more, establish racial animus).

Because Cox is unable to establish either prong of the prima facie case for his claim of a racially hostile work environment, TXU is entitled to judgment on this claim as a matter of law.

### C.  Plaintiff's Race Discrimination Claim

Under Title VII, a plaintiff bears the initial burden of establishing a prima facie case of race discrimination based on disparate treatment resulting in a tangible job detriment.  *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).  To meet this burden, a plaintiff must generally show (1) that plaintiff is a member of a protected class; (2) that plaintiff  was qualified for the position or benefit at issue; (3) that plaintiff suffered an adverse employment action; and (4) that plaintiff was treated less favorably than others.  *Exum v. U.S.Olympic Comm.,* 389 F.3d 1130, 1134 (10th Cir. 2004).  Once a plaintiff establishes a prima facie case of race discrimination, the burden then shifts to the employer to identify a non-discriminatory reason for its conduct.

*McDonnell Douglas, supra.* If the employer satisfies this burden, the plaintiff must then show that the proffered reasons are pretextual in order to prevail. *Id.* at 804.

TXU first argues that Cox cannot meet his burden of establishing a prima facie case of race discrimination because he cannot establish that he suffered an adverse employment action. More specifically, TXU argues that because Cox requested and was given a full severance package, his layoff in July of 2003 did not constitute an adverse employment action. This argument ignores the fact, however, that other ESA Group employees were able to continue their employment with TXU beyond July of 2003. I therefore conclude that Cox's early termination constitutes an adverse employment action.

TXU next argues that Cox cannot meet his burden of establishing a prima facie case of race discrimination because he cannot establish that similarly situated employees were treated differently. In response, Cox first argues that he was treated differently during the process by which he was promoted to Operations Manager of the ESA Group and in the powers he was given once he assumed that position. These facts, even if true, have no relevance to the alleged job detriment that Cox suffered, *ie.* the termination of his employment in July of 2003 for reasons unrelated to performance. Cox also argues that TXU retained a white female manager in the ESA Group at the time of his termination. The evidence fails to establish that this employee was similarly situated to Cox either in terms of compensation or job responsibilities. Specifically, this employee led the Tracking Staff for the ESA Goup and reported directly to Cox who served as Operations Manager for the entire ESA Group. In addition, the other two ESA Group employees who were terminated in July of 2003 were white. Under these circumstances, I conclude that Cox is unable to show that he was treated differently from other similarly situated employees and

9

therefore cannot establish a prima facie case for race discrimination.  TXU is thus entitled to

judgment on Cox's claim for race discrimination as a matter of law.

**D.  Plaintiff's Retaliation Claim Based on His Termination**

To establish a prima facie case of retaliation, a plaintiff must show (1) that plaintiff

engaged in protected opposition to discrimination; (2) that a reasonable plaintiff would have

found the challenged action materially adverse; and (3) that there is a causal connection between

the protected activity and the materially adverse action.  *Argo v. Blue Cross and Blue Shield of*

*Kansas, Inc.,* 4520 F.3d 1193, 1203 (10th Cir. 2006).  Once a plaintiff establishes a prima facie

case of retaliation, the defendant must articulate a legitimate, nondiscriminatory reason for the

adverse employment action .  *Id.*  The plaintiff  must then respond by demonstrating that the

defendant's asserted reasons for the adverse action are pretextual.  *Id.* at 1203.

TXU first argues that Cox cannot establish the second and third elements of a prima facie

case of retaliation based on his termination from TXU.  With regard to the second element, I have

already concluded that Cox's early layoff as compared to other employees of the ESA Group

constituted a materially adverse employment action.  Turning to the third element then of a prima

facie case of retaliation, Cox relies heavily on the temporal proximity between the time that he

began complaining about retention bonuses for the female ESA Group employees and submitted a

formal complaint regarding his treatment by Bohn and Harrison and his termination.  Indeed, the

Tenth Circuit has recognized that the requisite causal connection "may be demonstrated by

evidence of circumstances that justify an inference of retaliatory motive, such as protected

conduct closely followed by adverse action."  *Burrus v. United Tel. Co. of Kansas, Inc.,* 683 F.2d

339, 343 (10th Cir. 1982), *cert. denied,* 459 U.S. 1071 (1982).  Although TXU argues that the

circumstances which resulted in Cox' termination (*ie.* TXU's decision to sell its Strategic Accounts Business) were set in motion long before his complaints of harassment and discrimination, the fact remains that the decision to terminate Cox's employment was not made until after he brought these issues to TXU's attention. Under these circumstances, I conclude that Cox has presented sufficient evidence to establish a causal connection between his protected activity and his termination.

Having determined that Cox can sufficiently establish a prima facie case of retaliation based on his termination, the burden shifts to TXU to articulate a legitimate, non-discriminatory reason for this action. *Argo, supra.* In this regard, TXU's reduction-in-force in anticipation of selling its Strategic Accounts Business constitutes a legitimate, non-discriminatory reason for Cox's layoff. *See Furr v. Seagate Technology, Inc.,* 82 F.3d 980, 985 (10th Cir. 1996). Cox must therefore show that this proffered reason is pretextual to survive summary judgment on this claim. *Argo, supra.*

To establish that TXU's reliance on a reduction-in-force policy in advance of its sale of the ESA Group as the reason for his termination is pretextual, Cox points to the following: (1) Cox had been previously identified as a critical employee who was likely to be hired by the purchaser; (2) the ESA Group was to continue "business as usual" pending its sale; (3) Cox was responsible for managing the KDMC contract, which was one of the ESA Group's largest contracts; (4) planning had already commenced for new retention agreements for the ESA Group, including Cox, at the time of his termination; (5) after Cox's termination KDMC requested that he be brought back to service its contract with TXU; and (6) AEA, the party with whom TXU was

negotiating the sale of the ESA Group, might be interested in retaining some of the group's employees.

A proffered reason for an adverse employment action is not pretextual unless it is shown both that the reason was false, and that retaliation was the real reason. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993). Here, Cox has presented sufficient evidence to support a finding that TXU's proffered reason for his termination was false. Notably, although TXU's strategy for selling its Strategic Accounts Business and operating it in the interim may have changed as time passed, the facts set forth above could nonetheless support a finding that Cox's position was not subject to elimination as part of TXU's reduction-in-force so long as the business operations of the ESA Group continued. Likewise, I conclude that Cox has presented sufficient evidence to support a finding that retaliation for his complaints regarding harassment and discrimination of himself and other ESA Group employees was the real reason for his termination. Here again, the timing of events is telling as is the fact that the two other employees terminated in August of 2003 were also especially vocal about TXU's treatment of ESA Group employees. Accordingly then, TXU is not entitled to judgment as a matter of law on Cox's claim for retaliation based on his termination.

## E.  Plaintiff's Retaliation Claim Based on the KDMC Contract

The same legal standards set forth above are also applicable to Cox's claim for retaliation based on TXU's actions in not selling the KDMC contract to the new company that he formed after his termination. Thus, in order to establish a prima facie case for this claim, Cox must show that there is a causal connection between his actions in making complaints regarding

discrimination and harassment and TXU's failure to sell the KDMC contract to TSG. *Argo*, *supra*.

Cox testified in his deposition Harrison had essentially agreed to sell TSG the KDMC contract and two other healthcare facility contracts for $300,000, but instead proposed a purchase price of approximately $800,000 after Cox rebuffed his suggestion that he might have to release his claims against TXU as a condition of the sale. While this version of events suggests a possible casual connection between Cox's complaints and TXU's failure to sell him the KDMC contract, the terms of TXU's contract with AEA for the purchase of this contract undermines this conclusion. Specifically, AEA was offering to pay a substantially higher price for the KDMC contract than TSG. Nonetheless, because sale of the KDMC contract was subject to KDMC's approval, the sale price was but one consideration in TXU's negotiation for the sale of this contract. In fact, KDMC did not approve the sale of its contract with TXU to AEA, thereby rendering TXU's contract with AEA to be of essentially no value. There is also some ambiguity as to whether there were any further negotiations between TXU and Cox after the $229,000 offer was made. Under these circumstances, I conclude that there is sufficient evidence to establish the requisite causal connection between TXU's failure to sell the KDMC contract to TSG and Cox's complaints of harassment and discrimination and that Cox may therefore be able to establish a prima facie case of retaliation regarding the KDMC contract at trial.

The burden now shifts to TXU to articulate a legitimate, non-discriminatory reason for not selling the KDMC contract to Cox. *Argo*, *supra*. For the same reasons set forth above, I conclude that there is a triable issue as to whether TXU can meet this burden. In particular, although TXU claims that it did not sell the KDMC contract to Cox because TSG's bid was too

13

low, the fact remains that TXU earned no money at all from the sale of the KDMC contract. This same evidence could also support a finding of pretext. TXU is therefore not entitled to summary judgment on Cox's claim for retaliation based on the KDMC contract.

For the reasons set forth above, IT IS ORDERED that

1. Defendant TXU Energy Solutions Company, L.P.'s Motion for Summary Judgment [Doc # 54] is GRANTED IN PART and DENIED IN PART; and

2. Plaintiff Henry Clay Cox, Jr.'s claims for hostile work environment and race discrimination are hereby DISMISSED WITH PREJUDICE;

Dated: March ___16___, 2007, in Denver, Colorado.

BY THE COURT:

___s/Lewis T. Babcock_____
LEWIS T. BABCOCK, CHIEF JUDGE

14